UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

PATRICK A. VERCRUYSSE,

                    Petitioner,               Case No. 1:16-cv-60

v.                                  Honorable Janet T. Neff

BONITA HOFFNER,

                    Respondent.

_____/

**<u>OPINION</u>**

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Patrick A. Vercruysse is incarcerated with the Michigan Department of Corrections at the Lakeland Correctional Facility (LCF) in Branch County, Michigan. Following a seven-day jury trial in the Eaton County Circuit Court, Petitioner was convicted of first-degree murder, in violation of Mich. Comp. L. § 750.316, and receiving and concealing a stolen firearm, in violation of Mich. Comp. L. § 750.535b. On June 28, 2012, the court sentenced Petitioner to 20 to 30 years' imprisonment on the receiving-and-concealing conviction and life imprisonment without parole on the murder conviction.

        On January 18, 2016, Petitioner filed his habeas corpus petition. The Court ordered Petitioner to amend his petition, to file it on the approved form. (Order, ECF No. 2.) The petition, as amended, raised three grounds for relief, as follows:

    I.     Petitioner was denied of his constitutional right to due process by police and prosecutor misconduct by misrepresenting material evidence to the jury and failing to test or destroying material evidence.

    II.    Petitioner's conviction for first-degree murder must be vacated due to insufficiency of the evidence that he murdered the victim by strangulation.

III.   Petitioner must be afforded a new trial where the trial judge abused his judicial discretion in denying Petitioner's request for testing the clock fixtures as evidence supporting his claim.

(Am. Pet., ECF No. 3, PageID.49-50, 52.)

## Discussion

## I.   Procedural history in this Court

Respondent filed an answer to the amended petition (ECF No. 7) stating that the grounds should be denied because they lack merit.  Respondent also noted that Petitioner's habeas issue II, regarding sufficiency of the evidence, as stated in the petition, was exhausted.  Petitioner's argument regarding sufficiency, however, strayed beyond his statement of the issue.   In his argument, Petitioner challenged not only the proofs regarding strangulation, but the sufficiency of the proofs regarding intent and premeditation.  Petitioner had never raised those issues in the state courts.

After Respondent noted that Petitioner's second habeas issue, as argued, was unexhausted, Petitioner moved to stay these proceedings, and hold them in abeyance, until he had exhausted his new sufficiency issues and a new ineffective-assistance-of-appellate-counsel issue in the state courts.  (Pet'r's Mot. For Stay, ECF No. 13, PageID.1433) ("[Petitioner] urges the Court to allow him to return to the state courts and submit a post[-]conviction motion for relief from judgment on his alleged unexhausted habeas claim II and his new claim of ineffective assistance of appellate counsel.").  Petitioner directed the Court to Exhibit A to explain his "new claim of ineffective assistance of appellate counsel." (*Id.*)  Petitioner's Exhibit A was an affidavit from his appellate counsel, Mary Owens, in which she acknowledged that she could "only be described as incompetent" because, despite believing that Petitioner had received ineffective

assistance of trial counsel when trial counsel failed to object to the prosecutor misstating the facts in closing arguments and failed to object to police misconduct in neglecting to preserve evidence that was exculpatory, she failed to raise those issues on appeal.  (Aff., ECF No. 13-1, PageID.1441-1442.)

The Court granted Petitioner's requested stay.  (Order, ECF No. 18.)  In the order, however, the Court made no mention of Petitioner's new ineffective-assistance claims.  The Court only referenced the sufficiency-of-the-evidence claims.  The Court provided Petitioner a 30-day window to file his motion for relief from judgment in the state court.  Petitioner moved to extend that window by 90 days.  (ECF Nos. 19, 20.)  The Court denied the extension.  (Order, ECF No. 23.)

Almost two years passed.  On May 23, 2019, Petitioner returned with a motion to reopen the case and a proposed supplement to his petition.  (ECF Nos. 24, 25.)  The magistrate judge issued a report and recommendation, recommending that the case be reopened, but also recommending that the Court dismiss the supplemental issues because it did not appear that Petitioner filed his motion for relief from judgment within the 30-day window provided by the Court.  Additionally, even if Petitioner timely filed his state court motion, the magistrate judge recommended refusing to consider the ineffective assistance claims because they were never part of the amended petition.  The magistrate judge reasoned that Petitioner could not utilize the stay-and-abeyance procedure to supplement a pending habeas petition with new claims.  (R. & R., ECF No. 27, PageID.1552.)

Petitioner objected to the report and recommendation.  He argued that he had timely filed the state-court motion and that he had specifically advised the Court that he sought the stay

3

to raise the new ineffective-assistance-of-counsel claims in addition to the unexhausted sufficiency claims that were expressly raised in his amended petition.  The Court accepted Petitioner's proof regarding the timeliness of his state court motion for relief from judgment.  (Op. and Order, ECF No. 31.)  Accordingly, the Court determined that Petitioner had properly exhausted his sufficiency claim and that the Court would permit the claim to proceed in the reopened habeas proceedings. The Court rejected Petitioner's objections regarding the ineffective-assistance claims and ordered those claims dismissed.

Petitioner moved for reconsideration.  (ECF No. 33.)  The Court denied relief. (ECF No. 35.)  Petitioner then filed a notice of interlocutory appeal.  (ECF No. 36.)  The Sixth Circuit, however, dismissed the appeal for lack of jurisdiction.  (ECF No. 42.)

The petition is before the Court for resolution.  Upon review of the docketed materials, however, the Court concludes that reconsideration of Petitioner's objections is appropriate.  Petitioner argues that his introduction of the new ineffective-assistance-of-counsel claims is properly resolved based on determining whether they are timely, not whether they were raised in the amended petition in the first instance.  (Pet'r's Mot. For Recons., ECF No. 33, PageID.1587) (citing *Rhines v. Weber*, 544 U.S. 269 (2005), and *Mayle v. Felix*, 545 U.S. 644 (2005)).  The Court agrees.[1]  Accordingly, the Court will reconsider that portion of the opinion and order overruling Petitioner's first three objections.

---

[1] The Court's reliance on *Holt v. Lafler*, No. 1:08-cv-295 (W.D. Mich. Aug. 23, 2010), may have been misplaced in that the *Holt* petition was not a "mixed" petition such that it was not appropriately stayed unless one considered an entirely new claim raised for the first time in the motion for stay.  The instant petition, however, was "mixed." Therefore, the reasoning of *Holt* loses any persuasive edge when applied to this case.

The Court sustains those objections; but, reconsideration does not yield a different result.  As Petitioner acknowledges, his new ineffective-assistance-of-counsel claims are not properly added to his petition unless they relate back to his initial petition.  As set forth fully below, Petitioner's ineffective-assistance claims do not relate back.  He may not add them by way of his supplement because they are untimely.  Therefore, upon reconsideration, the Court will vacate the initial opinion and order adopting the report and recommendation.  The Court will enter a new order adopting in part and rejecting in part the report and recommendation for the reasons stated herein.

## II.    Petitioner's ineffective assistance claims are untimely

The AEDPA provides a one-year period of limitation:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Under § 2244(d)(1)(A), the one-year limitation period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." According to paragraph nine of Petitioner's amended petition, Petitioner appealed his conviction to the Michigan Court of Appeals and Michigan Supreme Court. The Michigan Supreme Court denied his application on October 28, 2014. Petitioner did not petition for certiorari to the United States Supreme Court. The one-year limitations period, however, did not begin to run until the ninety-day period in which Petitioner could have sought review in the United States Supreme Court had expired. *See Lawrence v. Florida*, 549 U.S. 327, 332-33 (2007); *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000). The ninety-day period expired on January 27, 2015.[2]

Petitioner had one year from January 27, 2015, or until January 27, 2016, to file his habeas application. Petitioner filed on January 18, 2016, with nine days left in the period of limitation.[3]

The one-year statute of limitations applies to each claim in a habeas application, as opposed to the application as a whole. *See Bachman v. Bagley*, 487 F.3d 979 (6th Cir. 2007); *see also Mardesich v. Cate*, 668 F.3d 1164, 1170 (9th Cir. 2012). Therefore, the claims Petitioner raised in his initial petition—claims that were raised within the one-year period after his state court conviction became final—are timely. However, any claims he added later might not be.

---

[2] The ninetieth day was Sunday, January 26, 2015. Under Supreme Court Rule 30, the last day of the filing period shall be included unless it is a Saturday, Sunday, or federal legal holiday, in which event the period runs until the next day. *Bronaugh*, 235 F.3d at 284.

[3] Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002). Petitioner signed his application on January 18, 2016. (Pet., ECF No. 1, PageID.32.) The petition was received by the Court on January 22, 2016. January 18, 2016, is the earliest possible filing date. *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (holding that the date the prisoner signs the document is deemed under Sixth Circuit law to be the date of handing to officials) (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006)).

In *Duncan v. Walker*, 533 U.S. 167, 181-82 (2001), the Supreme Court ruled that the limitations period is not tolled during the pendency of a federal habeas petition. Therefore, Petitioner's filing of his habeas petition did not stop the running of the period of limitation for claims not raised in the petition. Nine days after Petitioner filed his petition, the period of limitation expired for claims not raised in the petition.

Petitioner did not add his ineffective-assistance-of-counsel claims to the petition until he filed his supplement on May 22, 2019. Moreover, Petitioner did not even mention the potential existence of such claims until he filed his motion for stay on November 29, 2016. In that motion, Petitioner described the claims as "new." The claims, therefore, were raised for the first time months after the period of limitation expired.

Petitioner is aware of the timeliness problem. In his motion for reconsideration, he invites the Court to determine that the new ineffective assistance of counsel claims "relate back" to the initial petition because they share "a 'common core of operative facts' with the claims in the pending petition." (Pet'r's Mot. for Reconsideration, ECF No. 33, PageID.1587 (citing *Mayle*, 545 U.S. at 659).)

Federal Rule of Civil Procedure 15 provides: "An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . . ." Fed. R. Civ. P. 15(c)(1).[4]  In *Mayle*, petitioner Felix invited the Supreme Court to conclude that any new challenge to the conviction or sentence attacked in the initial petition necessarily arose out of the same conduct, transaction, or occurrence. The Supreme Court rejected that interpretation of the "relation back" rule as overly broad. The Court explained that

---

[4] The habeas corpus statute specifically provides that habeas petitions "may be amended . . . as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242.

7

an amended habeas petition does not relate back to the original petition "when it asserts a new ground or relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650.

For Petitioner's new ineffective-assistance claims to relate back, he must show that they arise out of the same conduct, transaction, or occurrence as the claims in his original petition. This Court must answer the question posed in *Mayle*:  Do the new claims share a common core of operative facts with the original claims?

Petitioner's new claims of ineffective assistance of appellate and trial counsel are premised on trial counsel's failure to object to prosecutorial misstatements and police misconduct and appellate counsel's failure to raise trial counsel's ineffectiveness on appeal.  (Aff., ECF No. 13-1.)  The underlying prosecutorial misstatements and police misconduct were part of Petitioner's initial petition; those issues are the crux of Petitioner's habeas issue I.  The petition is silent, however, with respect to trial counsel's failure to object or appellate counsel's failure to raise trial counsel's failure.[5]

The Sixth Circuit Court of Appeals' applications of *Mayle* make clear that Petitioner's new ineffective-assistance claims do not share a sufficient common core of operative facts and, therefore, do not relate back.  In *Watkins v. Deangelo-Kipp*, 854 F.3d 846 (6th Cir. 2017), the Sixth Circuit concluded that the petitioner's new specific claims of ineffective assistance of counsel did not relate back to his initial general claims of ineffective assistance of counsel.  In *Pinchon v. Myers*, 615 F.3d 631 (6th Cir. 2010), the Sixth Circuit concluded that the petitioner's new claims of ineffective assistance of counsel based on failures to object to

---

[5] Petitioner was well-aware of these issues at the time he filed his petition.  The affidavit describing the issues is dated weeks before Petitioner filed his initial petition in this Court.

8

evidentiary problems not previously raised did not relate back to his prior claims of regarding sufficiency of the evidence or jury instructions.  In *Hanserd v. Trierweiler*, No. 18-2404, 2020 WL 3053608, at *2 (6th Cir. Feb. 25, 2020), the Sixth Circuit considered and rejected the same type of "relation back" argument Petitioner raises here.  Petitioner Hanserd challenged a trial-court error in his initial petition; but, the court concluded that his subsequent claim that counsel was ineffective for failing to object to that trial court error did not relate back.  *Id*.

Petitioner's ineffective-assistance-of-counsel claims are certainly different in type from the claims he raised in his initial and amended petitions.  Petitioner did not challenge counsel's conduct at all in those petitions.  That does not mean that the new and old claims do not overlap.  Certainly, if Petitioner contends that counsel was ineffective for failing to challenge prosecutorial misconduct—the new claim—resolution of that claim will involve consideration of whether there was, in fact, prosecutorial misconduct—the initial claim.  However, *Hanserd* demonstrates that more commonality than that is required for relation back.  Therefore, the Court concludes that Petitioner's new ineffective-assistance-of-counsel claims do not share a sufficient common core of operative fact to warrant relation back.

After the period of limitation has expired, Petitioner has no right to amend his complaint under Rule 15 unless the proposed amendment relates back to the date of the original pleading.  *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008).  Because Petitioner's ineffective-assistance-of-counsel claims do not relate back, he has no right to include them in his amended (or supplemental) petition.  Accordingly, the Court will not permit Petitioner to proceed with those claims.  To the extent those claims are already part of Petitioner's habeas application, they are dismissed as untimely.  Alternatively, Petitioner is denied leave to amend his petition to include them and the Court will simply disregard them.

## III.    Factual allegations

The Michigan Court of Appeals described the facts underlying Petitioner's prosecution as follows:

On June 24, 2011, the 83-year-old victim told his son that he was going to visit defendant so defendant could pay him $1,000 of the $2,000 that he was owed. The victim never returned home and the police quickly identified defendant as a person of interest. Defendant admitted that he was with the victim for a short period of time, but told the police that he was unaware of the victim's present whereabouts. Approximately two weeks later, defendant's sister and brother-in-law observed that defendant apparently placed personal property bearing the victim's name in the brother-in-law's trailer. Defendant's brother-in-law immediately contacted the police, who promptly obtained a warrant and searched the trailer on July 16, 2011. The victim was found rolled up in a carpet inside the trailer. His feet were tied together with a coaxial cable and his head was covered with a plastic bag. A couch with blood stains was also discovered.

Detectives interviewed defendant at about 10:00 p.m. on July 16, 2011. During the interview, defendant explained that the victim drove to his house to discuss money. While in the garage, he and the victim started arguing. The victim unexpectedly pushed defendant, and defendant responded by pushing the victim to the ground which apparently knocked him unconscious. Defendant then exited the garage. Defendant stated that when he reentered the garage, the victim surprised him and hit him with a piece of metal that defendant thought might have been a clock. Defendant said he instinctually hit the victim with his hand and the victim "went down" and appeared to be dead. Defendant then went inside his house for at least 30 minutes. When he reentered the garage, he choked the victim with a cord, "making sure he was dead." Defendant said he placed a bag over the victim's head so he would not have to see it.

The next day, the police searched the garage and seized numerous items. The searching officers suspended the search during the afternoon while defendant performed a reenactment of the crime for other officers. During the reenactment, defendant did not identify the metal object with which he was allegedly struck. When the reenactment was complete, the officers seized any remaining items that appeared to have evidentiary value. One of the items seized was a brass light fixture, which officers believed to be the object best resembling a clock. At trial, defendant highlighted the prosecution's failure to test the light fixture for his DNA or the victim's fingerprints. Defendant argued that these tests would have corroborated his claim that he killed the victim only after he was assaulted with the light fixture. The prosecution observed that defendant never identified the light fixture during the reenactment, which suggested that he was not truthful about being hit with a metal object. In response, defendant contended that the fixture was removed from the garage by the police when they initially gathered evidence, before the reenactment.

(Mich. Ct. App. Op., ECF No. 8-13, PageID.721-722.)

The instructions to the jury were very specific. The trial court instructed the jurors that to find Petitioner guilty of first-degree murder, the prosecutor would have to prove, beyond a reasonable doubt, "that [Petitioner] caused the death of [the victim]; that is, that [the victim] died as a result of strangulation and/or suffocation." (Trial Tr. VII, ECF No. 8-10, PageID.667.) The jury found Petitioner guilty of first-degree murder; therefore, the jury necessarily found that the prosecutor had proven, beyond a reasonable doubt, that Petitioner killed the victim by strangling and/or suffocating him.

## IV.    AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299

F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37-38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods*, 575 U.S. at 316 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

**V.      Sufficiency of the evidence**

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA."  *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).  This standard erects "'a nearly insurmountable hurdle'" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds.  *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Petitioner challenges the sufficiency of the evidence regarding whether he murdered the victim by strangulation—an issue he raised on direct appeal—and whether Petitioner acted with premeditation and deliberation—an issue he raised in his motion for relief from judgment.  On direct appeal, the Michigan Court of Appeals concluded that the prosecution presented sufficient evidence that Petitioner had killed the victim by strangulation or suffocation.  (Mich. Ct. App. Op., ECF No. 8-13, PageID.724-725.)  And, in resolving Petitioner's motion for a directed verdict of acquittal or for a new trial, and then again in resolving Petitioner's motion for relief from judgment, the trial court determined that the prosecution presented sufficient evidence of Petitioner's premeditation and deliberation.  (Mot. Hr'g Tr., ECF No. 8-12, PageID.718; Eaton Cnty. Cir. Ct. Ord., ECF No. 25-1, PageID.1534.)

Petitioner's arguments with regard to both issues are not premised on attacking the evidence the Michigan courts, viewing the evidence in a light that favors the prosecution, found to be sufficient.  Instead, Petitioner invites this Court to view the evidence in a light that favors him— a perspective that is not permitted under the *Jackson* standard.  On the evidence of premeditation and deliberation, Petitioner argues:

> In this case, there is no evidence of premeditation and deliberation, much less evidence beyond a reasonable doubt.  The evidence showed that Defendant was on fairly friendly terms with Dr. Thompson, and had no motive to want him dead.  Defendant took no actions before the killing that showed anything other than his desire to accomplish roofing work at Dr. Thompson's home in order to repay Dr. Thompson the money he owed.  There was no acquiring of weapons, no pre-planning for concealment or an alibi.  The circumstances of the killing itself show no more than a sudden confrontation gone terribly awry.  If Dr. Thompson had been a younger and more robust man, the act of Defendant in shoving him would likely not have resulted in more than a painful bump on the head.  And, it should not be forgotten that Dr. Thompson shoved Defendant first - Defendant simply pushed him back.  Then, when Defendant returned to the garage, Dr. Thompson first hit him in the head with a clock, and Defendant then punched him and again pushed him down.
>
> There was nothing in the circumstantial evidence of the offense that showed other than an instantaneous quarrel between the two men, reprised when Dr. Thompson

14

hit him in the head with the clock.  Further, Defendant's actions afterwards were entirely consistent with sheer panic and an honest belief that Dr. Thompson had been killed when he fell after being shoved and hit his head on the concrete floor. There was no evidence that Defendant intended that Dr. Thompson hit his head on the concrete floor, or that Defendant intended anything other than a simple shove. It was unfortunate that Dr. Thompson fell and hit his head, but a shove is not "deadly force," nor is it evidence of premeditation.  *Morrin* held that a killing occurring during a sudden fight is insufficient to establish premeditation and deliberation.  There was no evidence whatever to show that Defendant thought about killing Dr. Thompson "beforehand," that he planned any harm whatever to Dr. Thompson or that he had threatened him, or that Dr. Thompson even felt afraid of Defendant.  In fact, the circumstantial evidence showed that Defendant wanted to make amends to Dr. Thompson for whatever Defendant had done wrong in the past.  Defendant's actions in covering up and hiding Dr. Thompson's body were entirely consistent with panic, in an honest belief that Dr. Thompson was already dead.

(Pet'r's Appl. for Leave to Appeal, ECF No. 25-1, PageID.1513-1514.)  Petitioner is absolutely correct.  Considering only the facts as Petitioner has described them, the jurors could have found that Petitioner was guilty of some crime less than first-degree murder.  Indeed, it is not impossible that the jurors might have concluded that Petitioner acted in self-defense.[6]  But, the question is not whether the jurors, viewing the evidence in a light favorable to Petitioner, could have found in his favor.

Viewing the evidence in a light that favors the prosecution, the evidence was more than sufficient to conclude that Petitioner, with premeditation and deliberation, intended to kill the victim by strangulation and/or suffocation.  The evidence supports Petitioner's contention that he and the victim fought.  The court of appeals recited Petitioner's testimony that "he instinctually hit the victim with his hand and the victim 'went down' and appeared to be dead."  (Mich. Ct. App. Op., ECF No. 8-13, PageID.722.)  That is where Petitioner would like the story to end, but the court of appeals went on:

---

[6] "The trial court instructed the jury on first-degree murder, second-degree murder, voluntary manslaughter, and self-defense."  (Mich. Ct. App. Op., ECF No. 8-13, PageID.722.)

[Petitioner] then went inside his house for at least 30 minutes.  When he reentered the garage, he choked the victim with a cord, "making sure he was dead."

(*Id.*)[7]  Was the victim alive when Petitioner choked him?  The court of appeals described the evidence before the jury on that question as follows:

> An expert witness opined that the victim died by strangulation or suffocation, or both.  She explained that the cartilage fractures in the victim's neck were consistent with strangulation, which was plainly consistent with the fact that the victim's body was discovered with cords around his neck.  The victim's mouth was gagged and two plastic bags covered his head when the body was discovered.   While the prosecution was not required to affirmatively disprove the theory that the victim died immediately from the head injury, see *People v Nowac*k, 462 Mich 392, 400; 614 NW2d 78 (2000), the expert explained that the relatively small cut found on the victim's head strongly suggested that the head injury was not sufficient to cause immediate death.   The expert also explained that the blood stains on the couch indicated that the victim was alive when defendant placed the cords around his neck and plastic bags over his head.  Moreover, defendant told police that he strangled and suffocated the victim to "finish the job."

(*Id.*, PageID.725.)

"The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)."  *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted).  Petitioner must rebut that presumption by clear and convincing evidence.  Here, Petitioner does not even challenge the appellate court's findings regarding the evidence; Petitioner simply ignores them.

Viewing the evidence in a light that favors the prosecution, there was sufficient evidence to support a jury's determination, beyond a reasonable doubt, that Petitioner premeditated and deliberated his strangulation or suffocation of the victim.  Petitioner has failed to show that the state courts' determinations of the sufficiency issues are based on findings of fact that are

---

[7] The Michigan Court of Appeals was looking at only the "strangulation or suffocation" side of the sufficiency challenge; but, the trial court relied on the same evidence to conclude that evidence of premeditation was sufficient. (Mot. Hr'g Tr., ECF No. 8-12, PageID.718) ("The prosecutor presented enough evidence, mainly through the actions of the defendant and his admissions, that he thought for over a half an hour on what his next move would be, to show that the defendant acted in a premeditated manner.").

16

unreasonable on the record or that those determinations are contrary to, or result from unreasonable applications of, *Jackson*, the clearly established federal law regarding sufficiency of the evidence. Therefore, Petitioner is not entitled to habeas relief on his sufficiency claims.

## VI.    Clock/light fixture

Petitioner's remaining habeas issues focus on an item of personal property that Petitioner claims the victim used to hit Petitioner in the head during their confrontation.  (Mich. Ct. App. Op., ECF No. 8-13, PageID.721-722) ("Defendant stated that when he reentered the garage, the victim surprised him and hit him with a piece of metal that defendant thought might have been a clock.").  Petitioner claims the metal object is important to supporting his version of the events.

### A.    Prosecutorial misconduct

Petitioner contends that the prosecutor misrepresented evidence regarding the metal object.  The prosecutor suggested to the jury that Petitioner's version of the events evolved over the course of a series of police interviews as Petitioner became aware of the facts the police knew. Petitioner denies that he adjusted his story.

The prosecutor posited that the story had changed with regard to several key facts, one of which was the metal object.  Petitioner claims that an understanding of the police investigation timeline is critical to understanding the prosecutor's misrepresentations regarding the metal object:

> Petitioner was arrested on July 16, 2011.  His first interview began that evening at 10:02 p.m.  This was before the collection of evidence from the garage began the next day and before Petitioner could make his story to coincide with whatever evidence would turn up.  The garage was processed on July 17, 2011, at approximately 2:00 p.m.  During the first interview, Petitioner said he contacted Dr. Thompson after [Petitioner] got out of prison to make arrangements to repay the money he owed.  But, because he had no money, [Petitioner] said he and Dr. Thompson agreed that [Petitioner] would work it out by repairs to the Midland home.  Petitioner and Thompson drove to the Wheaton Road garage to pick up extra

17

shingles or other materials.  While in the garage, Dr. Thompson demanded the money.  The interview transcript at page 7 states:

> Dr. Thompson pushed me and I pushed him back.  Dr. Thompson fell and hit his head on the concrete, then I went outside, I didn't know what to do, my sister shows up and I thought he was unconscious because he hit his head pretty hard and that's when I started freaking out, OK, my sister showed up, she says, where's my fucking car, I said it's at a friend of mine's house, she says whose van, I said a friend of mine's, she said get my fucking car home, because I had it overnight and I am not supposed to have it overnight.  I said I'll have it home here in a couple hours.  I went to go back in the garage, I opened the door up, and I don't know what he had in his hands because he was obviously standing at this time, he had some type of metal object in his hand.  He swung it and he hit me. . . . He hit me with something.  I don't know what it was.  It was some kind of piece of metal.  I think it was a clock to be honest with you but I'm not positive, a round clock.  I'm not sure but I think.  (Interview Tr. Pp 7-8)), *Id*.

The first DVD where the police pried open the garage door with a pry bar, clearly shows there is the 'metal object' "clock/fixture' right by the door where Petitioner says he was hit.  This evidence is clearly visible on the first DVD but was not played for the jury's review assessment on the evidence supporting the defense.  This is where the misrepresenting of the evidence comes into play, and where the prosecutor insinuates to the jury through her police witness's testimony that the defense regarding the light fixture was a lie.  (Tr V pp 79-111).

The numerous references to the clock/fixture—round metal object, it is inconceivable that the police and prosecutor were unaware of the significance of the object found in the garage and taken into custody before the reenactment.  In fact, the police referenced this object in its search warrant, noting that it was significant because Defendant said that Dr. Thompson had hit him with it.  Therefore, the police knew of its significance and the prosecutor had a duty to learn of its significance under *Kyles v. Whitley*, 514 US 419, 436 (1995).

Petitioner further asserts that notwithstanding the indisputable timelines of the events leading up to the arrest and the first video of the garage, the prosecutor repeatedly led the police witnesses in a line of inquiries designed to show that Petitioner was lying about having been hit by a clock fixture, by stating that he did not point out the clock during the reenactment.  Given the indisputable facts, the line of questioning by the trial APA and her closing arguments made to the jury, can only be termed deliberate, in order to make it appear that Petitioner was fabricating the story about having been hit with the clock by Dr. Thompson.  The APA told the jury that Petitioner could have pointed out the clock during the reenactment but did not.  Thus his story of having been hit was made up later, after he learned a metal object had been found.  Obviously Petitioner could not have pointed to the clock in the reenactment because it had already been removed and

18

taken into evidence in the first DVD video. Therefore the APA's summation to the jury was completely false.

(Addendum to the Am. Pet., ECF No. 3-1, PageID.71-73.)

Review of the prosecutor's closing reveals that the clock/fixture was one of many details that seemed to change as the police interviewed Petitioner. Whether or not the object was there when Petitioner reenacted the crime the day after the first interview was hardly the crux of the prosecutor's argument. The object figured far more prominently in Petitioner's counsel's closing. It was the foundation for Petitioner's claim that he was adequately provoked to take the actions that resulted in Dr. Thompson's death.

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487,

512 (6th Cir. 2003)).  Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'"  *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 645).  "This court has been reluctant to grant habeas petitions based on improper prosecutorial statements at closing argument."  *Wilson v. Mitchell*, 250 F.3d 388, 398 (6th Cir. 2001).  Prosecutors "must be given leeway to argue reasonable inferences from the evidence."  *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)).  Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington*, 562 U.S. at 103).

The trial court rejected Petitioner's claim concluding that there was no "evidence whatsoever that the prosecution misled anybody" because "[t]here was testimonies from three deputies regarding the events that happened during the reenactment."  (Eaton Cnty. Cir. Ct. Tr., ECF No. 8-12, PageID.718.)  Put differently, the trial court concluded that the prosecutor was simply commenting on the testimony of the deputies.  Petitioner presented nothing to suggest that the prosecutor knew that evidence to be false.

The Michigan Court of Appeals affirmed, but it took a different approach when it addressed Petitioner's claim:

> [T]he police searched the garage and seized numerous items.  The searching officers suspended the search during the afternoon while defendant performed a reenactment of the crime for other officers.  During the reenactment, defendant did not identify the metal object with which he was allegedly struck.  When the

reenactment was complete, the officers seized any remaining items that appeared to have evidentiary value.  One of the items seized was a brass light fixture, which officers believed to be the object best resembling a clock.  At trial, defendant highlighted the prosecution's failure to test the light fixture for his DNA or the victim's fingerprints.  Defendant argued that these tests would have corroborated his claim that he killed the victim only after he was assaulted with the light fixture.  The prosecution observed that defendant never identified the light fixture during the reenactment, which suggested that he was not truthful about being hit with a metal object.  In response, defendant contended that the fixture was removed from the garage by the police when they initially gathered evidence, before the reenactment.

The trial court instructed the jury on first-degree murder, second-degree murder, voluntary manslaughter, and self-defense.  The jury ultimately found defendant guilty of first-degree murder and receiving and concealing a stolen firearm.  Defendant subsequently moved for a directed verdict of acquittal, or alternatively a new trial.  Defendant argued that the prosecution presented incorrect facts to the jury when it contended that the light fixture was present during the reenactment.  Additionally, defendant argued that his due-process rights were violated when the light fixture was not tested for DNA and fingerprints before trial.  The trial court denied the motion because defendant failed to show suppression of evidence, intentional misconduct, or bad faith.  Further, the trial court noted that the evidence against defendant was overwhelming.

Defendant first argues that the prosecution committed misconduct by relying on false testimony from the officers that the light fixture was not seized until after the reenactment.  We review this unpreserved issue for plain error affecting substantial rights.  *People v Carines*, 460 Mich 750, 763; 597 NW2d 130.

*     *     *

Defendant overstates the legal relevance of the light fixture. Defendant argues that if the prosecution did not falsely imply that he was lying about being struck by an unidentified metal object, then he would have had a significantly stronger argument for voluntary manslaughter or self-defense.  Even assuming that defendant was able to submit undisputed evidence to the jury that he was unexpectedly hit by the victim with the light fixture, this fact would have no bearing on the outcome of the case.  When the defendant is the initial aggressor in a fatal confrontation, the victim's response cannot be "legally sufficient provocation" for the purposes of voluntary manslaughter.  See *People v Townes*, 391 Mich 578, 592-593; 218 NW2d 136 (1974).  Here, the facts show that defendant first used deadly force when he pushed the victim to the ground and apparently knocked him unconscious.  It was therefore a legally reasonable response for the victim to strike defendant in the head when he reentered the garage, as he was acting in lawful self-defense. *Id*. at 592.  Accordingly, defendant is unable to claim on appeal that the victim's alleged action with the light fixture constituted legally adequate provocation.  For the same reason, defendant is also unable to claim that he acted in self-defense. See *People v Reese*,

491 Mich 127, 158; 815 NW2d 85 (2012) (the aggressor in a confrontation cannot use self-defense as a complete justification to homicide).

Further, to warrant a conviction for voluntary manslaughter, "there cannot be a lapse of time during which a reasonable person could control his passions." *People v McMullan*, 284 Mich App 149, 156; 771 NW2d 810 (2009).  Defendant admitted to police that at least a 30-minute period elapsed before he reentered the garage to choke and suffocate the victim.  The reflection period of at least 30 minutes in the house was more than sufficient for a reasonable person to control his or her passions.  See *People v Pouncey*, 437 Mich 382, 385, 392; 471 NW2d 346 (1991).

(Mich. Ct. App.  Op., ECF No. 8-13, PageID.722-723.)

The court of appeals, therefore, concluded that, even if the prosecutor's reference to the presence of the metal object during the reenactment were deemed misconduct, Petitioner could not show a due process violation because Petitioner's "adequate provocation" and self-defense arguments were plainly meritless.  The state appellate court's determinations regarding the elements of Petitioner's defenses are conclusive.  It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  The decision of the state courts on a state-law issue is binding on a federal court. *See Johnson*, 559 U.S. at 138; *Wainwright v. Goode*, 464 U.S. 78, 84 (1983).  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). *See also Thomas v. Stephenson*, 898 F.3d 693, 700 n.1 (6th Cir. 2018) (same).  Moreover, the court of appeals' determinations of fact regarding Petitioner's admissions are reasonable on this record.

Bound by the appellate court's statement of state law, and giving appropriate deference to the state court's reasonable factual determinations, it necessarily follows that the court's further conclusion that there is no due process violation here is neither contrary to, nor an

unreasonable application of, the clearly established federal law cited above.  The misconduct, if any, in arguing that the fixture was there during the reenactment—while pointing out that Petitioner failed to identify it—is plainly insignificant and could not interfere with the fundamental fairness of Petitioner's trial if neither adequate provocation nor self-defense were available under state law.  Therefore, Petitioner is not entitled to habeas relief on this claim.

>    **B.      Failure to test the fixture for DNA or fingerprints**

Petitioner also contends that the prosecution denied him due process by not testing the fixture for DNA or fingerprints.  Petitioner claims that the presence of his own blood on the fixture and/or the presence of Dr. Thompson's fingerprints would have corroborated Petitioner's story of provocation.  For the same reasons, Petitioner claims the trial court should have ordered testing of the fixture.

The court of appeals rejected Petitioner's argument that the trial court should have ordered testing.  The court stated: "[f]or the reasons explained above, favorable test results would not support reversal on appeal because the evidence against defendant was overwhelming and whether he was hit with the light fixture has no legal relevance."  (Mich. Ct. App. Op., ECF No. 8-13, PageID.725.)  Petitioner disagrees with that assessment, but it follows from the appellate court's determination of state law issues—a determination that binds this Court.

Petitioner also disagrees with the court of appeals' resolution of his challenges to the prosecutor's failure to test the fixture.  Again, his disagreement is founded upon his conclusion that the results of the test—or any evidence regarding whether or not Dr. Thompson hit Petitioner—are relevant.  But, the appellate court did not rely on its conclusion that the evidence would have been legally irrelevant to reject Petitioner's claims.

Petitioner presented a multi-faceted argument as to why the prosecutor's failure to test violated Petitioners' constitutional rights:

(1) the government intentionally or in bad faith suppressed evidence favorable to his case;

(2) the government was required to conduct DNA and fingerprint tests on the light fixture;

(3) the failure to conduct DNA and fingerprint tests violated his right to present a complete defense; and

(4) the government failed to preserve potentially exculpatory evidence in violation of *Arizona v. Youngblood*, 488 U.S. 51 . . . (1988).

(*Id.*, PageID.723.) The court of appeals rejected every facet:

Defendant's first argument is meritless. "Absent a showing of suppression of evidence, intentional misconduct, or bad faith, the prosecutor and the police are not required to test evidence to accord a defendant due process." *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831 (2003). "Nor does due process require that the prosecution seek and find exculpatory evidence." *Id*. Here, defendant has not identified any instance of suppressed evidence, as the light fixture itself was admitted at trial. In addition, defendant has not identified any intentional misconduct or bad faith because there is no dispute that the light fixture was available for testing, had defendant actually sought testing before trial. See *People v Johnson*, 113 Mich App 650, 656; 318 NW2d 525 (1982).

With respect to defendant's second argument, the government has no affirmative obligation to test evidence on behalf of a defendant. *People v Anstey*, 476 Mich 436, 461; 719 NW2d 579 (2006). Moreover, defendant had an avenue for testing the light fixture before trial. MCR 6.201(A)(6) provides that a trial court "may order that a party be given the opportunity to test without destruction any tangible physical evidence." And MCL 775.15 provides that a trial court may appoint an expert for an indigent defendant when necessary. *People v Tanner* 469 Mich 437, 442-443; 671 NW2d 728 (2003); *People v Leonard*, 224 Mich App 569, 580-582; 569 NW2d 663 (1997). Defendant therefore had an opportunity to test the light fixture before trial on his own behalf.

Defendant's third argument is meritless as well. Because the police have no constitutional duty to develop potentially exculpatory evidence, failure to perform a test does not violate a defendant's right to present a defense. *Anstey*, 476 Mich at 461.

Defendant's fourth argument fails because the allegedly exculpatory evidence that he sought was not the light fixture itself, which was unquestionably admitted at trial. Rather, the evidence that he sought was a DNA test and a fingerprint test of the light fixture. There is no dispute that these tests were never conducted. "For due[-]process purposes, there is a crucial distinction between failing to disclose evidence that has been developed and failing to develop evidence in the first

instance." *Id*. When a defendant claims that his due-process rights were violated because a scientific analysis was not conducted, *Youngblood* is inapplicable. *Id*.

(*Id.*, PageID.723-724.) Although the court of appeals cited state court authority, that authority, in turn, relied on clearly established federal law. *People v. Anstey*, 719 N.W.2d 579, 593-95 (Mich. 2006) (citing *Youngblood*); *People v. Coy*, 669 N.W.2d 831, 844 (Mich. Ct. App. 2003) (same).

Petitioner labors to cast the failures of the prosecutor and police to perform DNA or fingerprint testing on the fixture as "suppression"; he cannot prevail on that argument. The appellate court's determination that the fixture itself was not suppressed is unassailable and well-supported on the record. Nor is there any evidence in the record to suggest that any testing was done on the fixture that might have been suppressed. Petitioner's argument boils down to a claim that the prosecutor or the police were constitutionally required to test the fixture. *Youngblood* makes clear, however, that "the police do not have a constitutional duty to perform any particular tests." 488 U.S. at 59. The Michigan Court of Appeals decision is entirely consistent with, and a reasonable application of, *Youngblood*, the clearly established federal law on this point. Accordingly, Petitioner is not entitled to habeas relief on the claim.

## **Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, I have

examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, I would not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

For the foregoing reasons, the Court will deny the habeas corpus petition and a certificate of appealability.

Dated:   <u>August 19, 2020</u>            <u>/s/ Janet T. Neff</u>
                                       Janet T. Neff
                                       United States District Judge

26